UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NORRIS MARSTON and | ) | |
| JONATHAN B. MARSTON, | ) | |
| INTERVENOR, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 10-10437-GAO |
| UNITED STATES OF AMERICA, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON MOTIONS TO ENFORCE SETTLEMENT AND TO REOPEN CASE

September 30, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises from an accident that occurred on or about August 24, 2008, when the plaintiff, Norris Marston ("Norris"), was performing dismantling work at the Ambrose Light Tower located off the coast of New Jersey.  The plaintiff claims that he sustained severe injuries, including a brain injury, when the boat landing he was working on gave way and drove him approximately eighty feet below the surface of the ocean.  By his First Amended Complaint, the plaintiff asserted claims in admiralty against the defendants, the United States of America (which was subsequently dismissed), Hallum Marine Construction ("Hallum"), Costello Dismantling Company, Inc. ("Costello"), and Semper Diving and Marine Corp.  ("Semper").  The defendants asserted cross-claims

against each other, and Hallum brought third-party claims for insurance coverage against Mark Sylvia Insurance Agency and Willis Group Holdings, a/k/a Willis of Massachusetts, Inc.

The matter is presently before the court on the defendants' motions to enforce a settlement (Docket Nos. 66, 67 and 71) and on the "Motion of Plaintiff, Intervenor, Jonathan B. Marston, to Reopen Case" (Docket No. 93).[1]  The issue raised by the parties' motions is whether Norris Marston was competent to enter into an enforceable settlement agreement with the defendants following a day-long mediation before Magistrate Judge Marianne B. Bowler on October 17, 2011.  It is undisputed that during the mediation the parties agreed to the terms of a settlement, which was memorialized in open court. Nevertheless, after the mediation the plaintiff's brother, Jonathan Brooks Marston, ("Brooks"), was appointed as Norris' conservator, and on December 21, 2011, this court allowed Brooks to intervene for the limited purpose of addressing whether Norris lacked the mental capacity to enter into a settlement agreement at the time of the mediation.

For the reasons detailed in this court's Memorandum of Decision and Order dated March 6, 2012 (Docket No. 108), this court concluded that the Intervenor had presented sufficient evidence of mental incapacity to require an evidentiary hearing as to whether Norris Marston, by reason of a mental illness or defect, was unable to understand in a reasonable manner the nature and consequences of the settlement between the parties on

---

[1]  The parties have consented to having these motions finally resolved by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Docket No. 146).

October 17, 2011.  <u>See</u> <u>Restatement (Second) of Contracts</u> § 15(1).  After discovery,

evidentiary hearings were held on August 13-15 & 17, and September 4 & 5, 2012.

      This is a disturbing case because the plaintiff is very unhappy about the results of

the mediation.  While mediation is an important tool in conflict resolution, it is a

voluntary process and every litigant has the right to reject an offer of settlement and to

have his or her case resolved through the litigation process.  Moreover, while some level

of dissatisfaction is not unusual since mediation, by its nature, involves compromise, it is

not the goal of the mediation process to cause a litigant distress.  Finally, as plaintiff's

present counsel has made clear, he believes that he could have obtained a higher

settlement on behalf of the plaintiff, a position on which this court expresses no opinion.

These concerns must, however, be balanced against the fact that the integrity of the

judicial process "would be ill served if those intimately involved in that process, litigants,

attorneys, and judges, could not rely on declarations of settlement made to the court. . . .

It defies logic and fundamental principles of fairness to allow a represented party who has

sought justice in a forum to contradict and undermine an agreement it reached and

acknowledged in that same forum[.]"  <u>Correia v. DeSimone</u>, 34 Mass. App. Ct. 601, 604,

614 N.D.2d 1014, 1016 (1993).

      In light of these principles, the plaintiff's burden to set aside the settlement is a

heavy one.  After careful consideration of the evidence presented and the arguments of

counsel, this court finds that the plaintiff has failed to meet his burden of proving that he

was unable to understand in a reasonable manner the nature and consequences of the

settlement reached on October 17, 2011.  His dissatisfaction with the result is not a

sufficient basis to set aside the settlement.  Therefore, the motion to reopen (Docket No.

93) is DENIED, and the motions to enforce the settlement agreement (Docket Nos. 66, 67

& 71) are ALLOWED.

## II.  <u>SCOPE OF THE ISSUES PRESENTED</u>

As this court ruled in the March 6, 2012 Memorandum of Decision, the standard to

be applied to these motions is found in the <u>Restatement (Second) of Contracts</u> § 15(1).

Based on the arguments of counsel at the time, the court in that Memorandum defined the

issue as "whether Norris Marston, by reason of a mental illness, (1) was unable to under-

stand in a reasonable manner the nature and consequences of the settlement between the

parties on October 17, 2011, or (2) was unable at that time to act in a reasonable manner

in relation to the settlement, and the defendants had reason to know of his condition."

(Docket No. 108 at 2).  At subsequent hearings the court clarified that the issue was

whether Marston had acted by reason of a mental illness <u>or</u> a mental defect, as stated in

the Restatement.  Significantly, plaintiff's counsel subsequently dropped his claim under

option (2) above, thereby eliminating from consideration the reasonableness of the

settlement.

In addition to expressly eliminating the legal issue of the reasonableness of the

settlement from consideration, the plaintiff asserted the attorney-client privilege with

respect to his communications with his original counsel before and during the mediation,

thereby shaping the scope of admissible evidence and precluding any evaluation of the

advice, if any, plaintiff had received prior to his decision to accept the settlement offer.

As the plaintiff[2] clarified his position in a "Memorandum of Law Regarding Attorney-

Client Privilege," which he filed on August 9, 2012, and in which he sought to limit the

testimony of his original counsel:

> As previously communicated to the Court at the Final Pre-trial conference, Norris continues to assert his attorney-client privilege, and has now so indicated to his former counsel in a letter dated August 2, 2012....   Norris asserts his privilege with respect to all communications with his former counsel, which occurred prior to October 17, 2011.  He further asserts his privilege with respect to all communications, which took place on October 17, 2011, the day of the mediation, with the exception of any alleged conversations he had with Orlando, McCormick and/or Judge Bowler, which took place after he had received Defendants' final settlement offer of $200,000.00.
>
> However, with respect to these post-offer conversations, because Attorney Orlando has gone on record denying that they ever occurred, there is no factual basis for the Court to permit such inquiry.

(Docket No. 131 at 4).  The plaintiff had also asserted the attorney-client privilege during

the depositions of the plaintiff and his medical expert, which had preceded the

evidentiary hearings.

   During the plaintiff's case, there were limited waivers of the attorney-client

privilege relating to specific conversations.  Nevertheless the plaintiff continued to assert

that a blanket waiver had not occurred.  For example, on August 30, 2012 the plaintiff

filed a "Motion in Limine Regarding Attorney-Client Privilege" seeking to identify the

---

[2] For clarity, the court will not distinguish between the plaintiff and the Intervenor when describing their co-extensive legal positions.

limited permissible areas of inquiry and confirming that the attorney-client privilege had not been waived generally.  (Docket No. 141).  The court limited the testimony of witnesses accordingly.[3]

It is, therefore, important to recognize that this court has no opinion as to the reasonableness of the settlement.  Not only was the underlying liability case not tried, but there also was virtually no evidence concerning what actually happened at the mediation. The evidence is that the defendants opened with an offer of approximately $30,000 against a demand of $900,000, and ended at $200,000 plus a waiver of a workers compensation lien.  However, there is no evidence as to how either side was persuaded to change its position.

Plaintiffs settle cases for a variety of reasons including, without limitation, the ability to prove one's case, the likelihood of being paid if you prevail at trial, the costs and expenses of litigation, the uncertainty as to how events will be perceived by a jury, the length of time before a matter would be finally resolved, and other general risks involved in proceeding to litigate instead of taking the amount guaranteed at the mediation.  The evidence before this court on any of these subjects was virtually non-

---

[3]  Admittedly, in the fifth day of the hearings the plaintiff took the position that it was necessary for him to explore with prior counsel, who had been called by the defendants as witnesses, what had been explained to the plaintiff during the mediation, in order to prove that the plaintiff did not have sufficient information to settle the case and could not have understood the consequences of his decision to settle.  At that point the court refused to allow a broad waiver of the attorney-client privilege, which was inconsistent with the prior position repeatedly taken by the plaintiff and which would have required the recalling of several significant witnesses, including the plaintiff and medical experts.

existent.  Thus, while much of the testimony and even the expert's opinion assumed that

the settlement figure was too low, this court cannot and will not make such an assump-

tion.  Rather, this court is neutral on the reasonableness of the settlement.

Finally, there is no issue before this court as to whether an agreement was actually

reached at the mediation.  As plaintiff's counsel made clear, "Norris admits that he

accepted" the offer of $200,000, and that the "acceptance was subsequently reported on

the record to Judge Bowler on that day by Attorney Orlando."  (Docket No. 131 at 3).

Moreover, the plaintiff has expressly withdrawn from this court's consideration any claim

that the plaintiff was unduly pressured into accepting the settlement, or that he accepted it

under duress.  (Id. at 4).  Therefore, this court's decision is limited to the issue of the

plaintiff's competency to enter into the settlement agreement.

With these limitations in mind, the court makes the following findings of fact

based on the evidence presented.

### III.   FINDINGS OF FACT

### Norris Marston - Background

Norris Marston, a/k/a "Tiger," is one of seven siblings in a close knit family.  He is

particularly close to his brother Jonathan Brooks Marston, a/k/a "Brooks," who is five

years younger than Norris.  Brooks lives in Duxbury, and Norris lives on a 32 acre "farm"

in Gloucester.  The farm is owned in trust and Brooks is one of the trustees, along with a

brother-in-law.  Although older than Brooks, Norris was not considered for a trustee, in

part due to his lack of financial acumen.  Norris has lived apparently rent-free for many

years in a water tower that he converted into a dwelling on the property.  He has also been working on constructing a barn on the property for about 12 years.  He is responsible for part of the property taxes on the property.

Norris has never married.  He has a daughter Brooke, approximately 11 years old, with whom he has always maintained a close relationship.  He pays child support weekly.

Norris graduated from Taunton High School, after which he worked as a commercial fisherman for many years.  According to Norris, he worked harpooning swordfish when he was 14, did crab fishing in Alaska when he was 16 and then did sword fishing on the Grand Banks for a number of years.  He did not consider going to college after high school.  However, because "fishing is a terrible way to get old," according to Norris, he eventually attended Embry-Riddle Aeronautical University in Daytona Beach, Florida, where he obtained his pilot's license.  Norris' father had been a commercial pilot, which helped motivate him to attend flight school.  According to Norris, he was "middle of the road academically" at the school, but 3rd in his class for flying.  Brooks confirmed that Norris was never a real "reader," and that he was more inclined toward mechanical things.

After obtaining his pilot's license, Norris tried working as a flight instructor in Beverly, Massachusetts, but he wasn't making enough money.  He then decided to return to Gloucester where he went back into commercial fishing, which paid well, although it was very physically difficult work.  Norris worked on a herring boat for 10-12 years or so, beginning in or around 1986.

-8-

After leaving fishing, Norris started his own marine construction business.  He built a barge and built/bought a crane and a skiff that operates as a tug.  Both before and after the accident Norris ran the business himself.  He operated the equipment, bid on various jobs, maintained whatever books and records were kept, was responsible for billings and receipts, and made whatever arrangements were necessary to fulfill the jobs.  As detailed infra, since the accident Norris has been more limited in the physical activities in which he can engage and has required more assistance in completing jobs, including in drafting schematics for the work.  However, although the financial aspects of his business apparently have never been his strong point, no one has ever helped him with this work.  Brooks, the conservator, has not felt the need to become involved even after the accident.

As Brooks described his brother before the accident, he was "highly accomplished" in doing his work and "awful" as a businessman, including estimating the costs of projects, invoicing and the like.  Nevertheless, Norris was self sufficient.  Brooks also testified that Norris was known to "embellish" his stories, and that while the brothers were close, Brooks was often frustrated and impatient with Norris before the accident.

Norris has always been mechanically inclined.  He testified that he has designed a hydroelectric power plant and hopes to market it someday.

As of the time of the accident, Norris was romantically involved with Susan Giglio, the divorced mother of two teen-age boys.  They were very close although they did not live together.  She described Norris as being funny and outgoing before the

accident, and with having a good reputation.  Ms. Giglio did not get involved in the

financial aspects of Norris' business before or after the accident either.

## The Accident

The accident occurred on or about August 24, 2008 while Norris was performing

dismantling work at the Ambrose Light Tower located off of the coast of New Jersey.

The facts surrounding the accident are very much in dispute, and were not

explored during the evidentiary hearings.  It is undisputed that after the accident Norris

made some sort of joke, showered, and returned to work.  He was first seen in the

Emergency Room on September 1, 2008, after he had returned to Massachusetts, and he

did not tell anyone, including Brooks and Ms. Giglio, about the accident until he returned

to Massachusetts.

According to the Emergency Room notes, Norris described the accident as follow:

> This usually healthy 50-year-old man who was working on an
> offshore barge 10 days ago when a huge piece of steel came down
> struck him in the head and dragged him 80 feet under the water.  It
> then tipped and he was able to get up to the surface.  He thinks he
> lost consciousness for about 2 seconds.  When he surfaced, he took a
> shower, changed his clothes and went back to work.  He since then
> had a headache, trouble with his equilibrium, and pain in his right
> ear.  No fever.  He felt mildly nauseous.  No vomiting.

(A15).[4]  Physically, Norris had a 2 cm round abrasion on the top of his head.  (A15).

---

[4]  In addition to being admitted as exhibits, the medical records had been filed with the
court as Exhibit A to Dr. Isaac's Affidavit (Docket No. 102-1).  For ease of reference the court
will cite to the pages in Exhibit A, as was done during the hearings.

At the mediation, the defendants took the position that Norris had barely gotten hit, had only a scratch on his head, and that basically there was nothing wrong with him. While Norris' description of events changed somewhat over time, it remained substantially the same.

## General Observations Concerning Norris' Condition

There was a great deal of testimony concerning Norris' condition during the period between the accident (on or about August 24, 2008) and the mediation (October 17, 2011).  His medical evaluations will be discussed infra.  As detailed herein, Norris' friends and family observed a change in his demeanor and behavior, with some days being better than others.  Nevertheless, prior to the mediation, no-one had expressed any concern about Norris' ability to live on his own and to handle his own affairs.

According to Norris, he suffers from frequent headaches which are debilitating at times.  He has difficulty sleeping, is often queasy and off-balance, and has trouble remembering things.  While Norris has continued to operate his business, his balance is off so he won't work on unstable surfaces such a rocks or on heights, and he tires more easily than before the accident.  Norris is no longer able to do design drawings for projects.  His friends work with him more frequently now than before the accident.  He becomes frustrated at his inability to recall things.

According to Brooks, since the accident Norris has had a "lack of confidence in his ability to deliver on his work," not based on his mental capacity but because of a lack of physical stamina and not being able to "stay on task."  Norris complains of headaches

-11-

often and complains about his physical well being.  He tires more easily.  According to

Brooks, Norris has always engaged in somewhat "erratic" and "stream of consciousness

conversations" which have intensified a little since the accident.  Similarly, while Brooks

has always had concerns about Norris' "decision-making abilities," those concerns have

intensified since the accident.  Norris was somewhat unreliable in the past, but Brooks

feels that the situation has gotten somewhat worse.

Susan Giglio remains a friend of Norris, although they are no longer romantically

involved.  She testified that since the accident Norris has changed.  He complains a lot, is

not sleeping well, has headaches, and lacks stamina.  He is "not the same person."

According to Ms. Giglio, Norris is forgetful and repeats stories.  Nevertheless, Norris has

always been a good father.

James Russell Skinner, a friend and co-worker, testified on Norris' behalf.  He

testified that since the accident Norris has been less stable, and won't walk on joists or

jump on rocks.  He tires more easily and is working fewer hours.  He is sending more

work to Skinner than he did before the accident.  While Norris is more forgetful now, he

is still "hilarious" according to Skinner.  Sometimes Norris "looks off" at work, and they

send him home.  Skinner says that Norris was, and continues to be, a responsible father.

Edwin Perkins also testified on behalf of Norris.  He hired Norris about 15 years

ago and they became good friends.  According to Perkins, Norris was an excellent worker

before the accident and very smart and clever.  Since the accident, however, Norris can't

really concentrate, can't complete a job, only works for a few hours and loses track of

what he is doing.  As an example, Perkins testified that while working machinery with

which he was familiar, all of a sudden Norris could not recall which lever to push or pull,

and he had to stop.  According to Perkins, by the end of the day Norris has faded

physically and is "mentally gone."  Norris has good days and bad.  On bad days, he has

bad headaches, is dizzy and vomits.[5]

Chad Ketchopulos also testified on behalf of Norris.  He and Norris have been

friends and worked together on marine construction projects since the early 1990s.

Ketchopulos would do the land based part of the job, and Norris would do the marine

based part.  Since 1992, Ketchopulos has run his own construction company in

Gloucester called Under Pressure Construction.

According to Ketchopulos, since the accident Norris gets dizzy at heights, and is

light-headed on occasion.  He drifts and is not as focused as he used to be.  Norris is no

longer able to do the design drawings for projects, and Ketchopulos has done them for

him on occasion.

In contrast to this testimony about his inability to work, the defendants point to

Norris' installation of the "greasy pole" in Gloucester harbor, an event which garnered

much publicity.  He drove the pilings, constructed the platform and installed the pole with

the assistance of Chad Ketchopulos and others.  The plaintiff has minimized his ability to

do the job, pointing to the fact that he needed help and that three pilings, which Norris

---

[5]  This court notes that Perkins' description of Norris' condition was much more extreme than any other witness, including Norris himself.

positioned with the help of others, were initially installed incorrectly and had to be moved.

Even accepting the plaintiff's description of events, it appears to this court that Norris was actively involved in the job under the eyes of the town, and successfully completed the task with the participation of others.  (See Exhibits 13, 15 and 16).  Norris was also able to give interviews about the job to the local press, describing the work that was done, and telling his story with flair.  (Id.)  This court does not need to determine how much, if at all, plaintiff's ability to work was compromised by the accident.  This court does find, however, that Norris was able to engage in conversations, continue to operate his business (albeit at a lesser pace and with physical restrictions), understand the scope of what needed to be done and how to accomplish the goal, and otherwise engage in everyday activities.  While Norris' thought processing might be slower, and he may lose concentration at times, he nevertheless is able to understand what needs to be done, and, perhaps most importantly, when he needs help.

Despite any of their concerns about Norris' physical limitations, or even his ability to "stay on task" after the accident, none of the plaintiff's friends or family members felt any need to involve themselves in Norris' personal or business affairs.  For example, despite any concerns that he may have had, Brooks never considered getting involved in his brother's day-to-day affairs and left him free to manage his own business and life.  Brooks testified that he never considered a conservatorship, and that the conservatorship

was Attorney Miller's idea.  As discussed _infra_, the only purpose of the conservatorship apparently was to reopen the lawsuit.

Like Brooks, Ms. Giglio has never been involved in Norris' business and has not felt the need to be involved in his day-to-day affairs.  She never thought that a conservator was needed and does not appear to have had any concerns about Norris living on his own, or managing his own affairs.

Chad Ketchopulos started to do drawings for Norris, and attended meetings with him because he felt that Norris could no longer make effective presentations.  Neverthe-less, Ketchopulos admitted that Norris continued to do jobs on his own, and that Norris still made a significant contribution to the projects on which they worked together, even if Ketchopulos was taking on more responsibility.

During the evidentiary hearings, Norris testified over the course of four days (interspersed with other witnesses' testimony).  The court did not observe any of the difficulties in concentration about which Norris complained.

Initially Norris had difficulty hearing, but the problem was solved with the use of a translator's ear microphones.  Apart from the hearing problem, Norris did not exhibit any symptoms anyone had described, and seemed fully cognizant of the issues in dispute.  He was fully involved in the court process.

Norris answered questions on direct and cross-examination fluently and without hesitation.  He had virtually total recall in response to most questions.  For example, he testified in detail about his early years, his educational and work experience, the equip-

ment he owns in his business and how and when it was acquired, the details of the jobs in which he was engaged, including such details as for which jobs one needs a permit and which type of work does not require permitting.  He recalled the dimensions of the greasy pole and how many pilings and cross-bracings were involved in the project.  Norris knew the identity of his family and friends, the names and ages of Ms. Giglio's children, the activities which his daughter enjoys and the details of the things they do together, the amount of child support he pays, and the like.  As detailed <u>infra</u>, he testified about a number of specific conversations that had taken place in connection with the mediation.  He testified concerning the doctors he visited and their roles.  He recalled the events surrounding the appointment of the conservator and his appearance in court in connection with that appointment.  Norris  showed a sense of humor during his testimony, for example calling the conference rooms outside the courtroom the "penalty box."  He also held his own during cross-examination and sparred with counsel at times.  For example, when counsel asked if could see the ocean from the courthouse, he answered that it was a harbor, not the ocean.  When asked if a $1 million settlement would make him happy, he responded that nothing would make him happy given his injuries, and that happy was not the right word.  He stated he did not understand the question when he needed a question rephrased.  His demeanor and responses were entirely appropriate throughout the course of his examination.  To the extent he testified that he could not recall things, the memory lapses seemed consistent with the passage of time.

### **Medical Treatment**

While there is evidence in his medical records that Norris suffered a traumatic brain injury on or about August 24, 2008, there is nothing in Norris' medical records prior to the mediation which would in any way indicate that Norris was unable to understand in a reasonable manner the nature and consequences of an agreement to settle the litigation.

This was not a trial on damages, nor, as detailed above, was it a hearing on the reasonableness of the amount of the settlement given the extent of Norris' injuries. Similarly, it is not relevant whether Norris' condition on the day of the mediation was causally related to the accident. Therefore, there is no need for this court to review the medical treatment Norris received in detail. Rather, this court will attempt to summarize the treatment Norris received up until the time of the mediation. Subsequent medical treatment will be discussed infra in connection with the appointment of the conservator.

Norris' primary treating physician was Dr. Jay Isaac. Dr. Isaac, who testified, has been Board certified in internal medicine since 1999, and practices with Cape Ann Medical Center in Gloucester, Massachusetts. Dr. Isaac works with a physician's assistant, Beth Shanks.

While Dr. Isaac has treated a few patients with post-concussion syndrome, it is a very small part of his practice.

Norris was also seen by Dr. Paul Thomas Gross, a Board certified neurologist and Chairman of the Department of Neurology at Lahey Clinic. Dr. Gross also testified.

Norris's significant doctors' visits occurred on the following occasions prior to the

mediation:

| | |
|---|---|
| 9/1/08 | Emergency room visit.  (A15) |
| 9/10/08 | Dr. Isaac (A11) |
| 9/19/08 | Dr. Gross (A18) |
| 10/16/08 | Dr. Isaac (A22) |
| 10/20/08 | Dr. Gross (A26) |
| 11/7/08 | Neuropsychological evaluation at Lahey Clinic (A28) |
| 3/27/09 | Beverly Hospital Speech-language evaluation (A33) |
| 4/3/09 | Dr. Isaac (A39) |
| 5/22/09 | Dr. Gross (Ex. 4) |
| 8/20/09 | Dr. Gross (A44) |
| 11/13/09 | Dr. Gross (Ex. 4) |
| 7/13/10 | Dr. Isaac (A46) |
| 10/13/10 | Dr. Isaac (A51) |
| 10/22/10 | PA Shanks (Ex. 2) |
| 10/29/10 | PA Shanks (A56) |
| 11/15/10 | Dr. Isaac (Ex. 2) |
| | |
| 11/24/10 | Dr. Isaac (Ex. 2) |
| 2/7/11 | PA Shanks (A60) |
| 8/8/11 | PA Shanks (A65) |

All objective tests, such as an MRI, CT scan, and EEG were negative, which is not

unusual in the case of brain injuries.

As a general statement, Norris was diagnosed by both Dr. Isaac and Dr. Gross as

having a traumatic brain injury and post-concussion syndrome.  He may also have

suffered an anoxic brain injury due to having been submerged in water and deprived of

oxygen for an extended period of time.  By 2009, the doctors had added diagnoses of

sleep apnea and some depression, and were treating Norris for these conditions as well.

Norris's principle complaints were constant headaches, poor memory and concentration, and problems with his equilibrium.

The medical records show that there was some improvement in Norris' condition over time, but there were good days and bad.  For example, Norris reported to Dr. Isaac on April 3, 2009 that "overall, there has been improvement in terms of memory and cognitive functioning, but the pace of recovery has been slow for him."  (A39).  At the July 13, 2010 visit with Dr. Isaac, Norris reported that he was "a little more functional than a few months ago," especially with regular use of the machine for sleep apnea. (A46).  However, on October 13, 2010 Norris reported to Dr. Isaac that he was "not improving."  (A53).  On August 8, 2011, while Norris was working with a chain saw over his head, he felt dizzy, his arms got heavy and he was incontinent.  (A65).  Nevertheless, based on his own observations Dr. Isaac continuously reported that Norris was "alert and cooperative" and exhibited a "normal mood and affect" as well as a "normal attention span and concentration"  (E.g., A13, 41, 48, 53, Ex. 2 at 57).

Similarly, Dr. Gross reported on May 22, 2009 that Norris reported that he was "slowly improving" and was "able to concentrate better and organize himself better" and that he "tries to work 6 hours straight and does not take a rest or food-or-drink break." (Ex. 4).  On August 20, 2009, Dr. Gross again noted based on Norris' reports that there were "gradual improvements," although Norris still was "having difficulty with concentration and attention and needs to relearn things."  (A44).  Dr. Gross also gave his "impression" of Norris' condition as follows:

    1.      Severe anoxic brain injury, slowly improving.
    2.      He probably has obstructive sleep apnea.
    3.      He may also have narcolepsy.

(A44).

Norris was seen by Dr. Gross again on November 13, 2009, at which time they discussed the fact that he had been diagnosed with severe obstructive sleep apnea, but had not yet started treatment.  (Ex. 4).  According to Dr. Gross, as of that time Norris "continues to complain of memory difficulty and having good and bad days.  There are some days when he can work 8 hours or more, but others when he has trouble working at all."  (Id.).  The doctor noted that if treatment for the sleep apnea was not successful, "a psychiatric evaluation might be helpful."  (Id.).  This was Dr. Gross' last visit with Norris before the mediation.  Other records establish that Norris did undergo treatment for his sleep apnea for awhile, but then apparently discontinued sleeping with the prescribed oxygen mask.

There is virtually no information in the records which would assist this court in determining how Norris' complaints about an inability to concentrate or problems with memory translates into the plaintiff's cognitive ability to enter into an agreement.  As of the time of the mediation, there is nothing in the record which in any way indicates any concern on the part of the doctors with Norris' ability to live on his own or to handle his own affairs.  There is no indication of any concern about his ability to follow the instructions of the doctors, and he attended virtually all of the appointments on his own. The doctors did opine that he should not work because of their fear that he could hurt

himself, since he got drowsy and worked with heavy equipment.  (E.g., A53-54).  There

are also some indications that Norris was advised that he should not fly an airplane or

ride his motorcycle because he could not react quickly to an emergency situation.  (E.g.,

A36-37, 30).  There are no other limitations reflected in the medical records.  To the

extent that the doctors opined after the mediation that Norris lacked the mental capacity

to make significant decisions on his own behalf, as discussed infra, there is no precursor

to such opinions in the records which pre-date the mediation.

Norris underwent a comprehensive neuropsychological evaluation on November 7,

2008, which is the only report which provides any context for an evaluation of Norris'

complaints.  Of some significance, Dr. Macaulay who conducted the exam found that

Norris exhibited "mild executive dysfunction" in that he scored average and high average

on all tests except for "phonemic verbal fluency" which was "mildly impaired for his

age" and caused him significant frustration, and he made "a significant number of

repetition errors on a list learning task, suggesting reduced self-monitoring."  (A29).

As Dr. Gross testified, executive function is the ability to put a lot of things

together in your mind in an organized way and to act on them.  Multi-tasking, for

example, is an executive function.  The parties agree that Norris' level of executive

functioning is relevant to determining if he was competent to enter into the settlement.

As Dr. Maacaulay reported in part:

> Current neuropsychological evaluation reveals mild inattention (i.e.
> auditory attentional capacity), and mild executive dysfunction (e.g.
> phonemic fluency and self-monitoring).  It is possible that he was

exhibiting mildly slowed reaction time and processing speed that have significantly improved over the period of a week.  It is likely that he is most sensitive to the mildly slowed processing speed and inattention, and that these are negatively impacted by depressed mood, anxiety, and fatigue.  The cognitive deficits that he is exhibiting are consistent with the type of anoxic/hypoxic injury he sustained; however, it is certainly reassuring that he is not exhibiting significant memory impairment or greater attentional or executive dysfunction.  Given the time post-injury and the injury he sustained, he is performing better from a cognitive perspective than anticipated and this is certainly encouraging and reassuring from a prognostic perspective.  It is anticipated that he will continue to experience and perceive significant improvement over the next few months with expected plateau in ~10-12 months but the greatest improvement expected within the first 6 months.  As previously stated, he is exhibiting a mild but significant degree of depression and anxiety and as well as fatigue that are likely significantly and negatively impacting and exacerbating cognitive difficulties in day-to-day functioning.  It is a frequent occurrence that individuals who sustain brain injury also experience co-morbid depression and anxiety, and it was discussed with him that affective disturbance can prolong recovery and it will be important to routinely monitor and treat if necessary.  He should be reassured by these findings, particularly given time post-injury.

The results and recommendations for the most part were reviewed with Mr. Marston prior to the completion of this evaluation.  It was discussed with him if he is not feeling better from a mood or fatigue perspective in the next few weeks, that he should contact his primary care physician or Dr. Gross, to address the mood related issues as this is likely negatively impacting his performance.  He is also encouraged to allow himself appropriate time to process and retrieve information.  He will benefit from new information being presented to him with repetition, for him to allow himself appropriate time to consolidate and retrieve new information, and if he experiences difficulty spontaneously recalling the information, to be provided with cues, though he likely would not need cues.  If he experiences difficulty comprehending any material that he has read, then it may be beneficial for him to re-read it.  He did attempt to return to work this week, but his crew sent him home as he was experiencing difficulties.  It was discussed that these difficulties he described were

> likely due to inattention and fatigue, and it will be beneficial for him
> not to return to work, at least for the next month, but appropriateness
> to return to work may be re-evaluated after one month.  He also
> should abstain from flying and riding his motorcycle, at least for the
> next few months....

(A30).

Thus, even a liberal reading of the records establishes that Norris could compen-

sate for limitations in executive functioning, if any, by giving himself "appropriate time to

process and retrieve information" and to have information repeated to him if necessary.

(Id.).

## The Mediation

Norris obtained counsel to bring the lawsuit relating to the accident on his own; he

did not ask for anyone's assistance.  There is some indication that Norris went to a

different attorney before settling on Orlando & Associates in Gloucester, Massachusetts.

According to Norris, he hired Attorney Orlando but got Attorney McCormick, "the

second in command," instead.  In any event, it is undisputed that Attorney McCormick

was primarily responsible for handling Norris' case, but that both Attorney Orlando and

Attorney McCormick attended the mediation.  Both attorneys are experienced personal

injury/maritime attorneys.

Norris was aware that a mediation was going to take place for at least some period

before the mediation.  He told Brooks about the mediation and asked if he would go with

him.  While Brooks agreed to go, apparently Norris failed to tell him the date the

mediation was going to take place.

According to Norris, he understood that the mediation was an attempt to settle the case.  Attorney McCormick had told him that it was no big deal, and that if he didn't like the result he could just go to trial.

Attorneys Orlando and McCormick testified that Norris came to their office to prepare for the mediation, which Norris denies.  This fact is not critical to this court's decision, and the conflict does not have to be resolved.  This court does note, however, that since the attorneys stood to be paid more the larger the settlement, and there is no evidence that they were not desirous of obtaining the most they could for the plaintiff, this court finds it most likely that Norris was somehow prepared in anticipation of the mediation, either on the phone or in person.[6]

Norris drove to the courthouse with Attorney McCormick for the mediation on October 17, 2011.  During the ride, Norris saw the demand letter and realized that the demand was for $900,000 and not the $1 million that he had understood the case was worth.  According to Norris, he had a fight with Attorney McCormick about that, which the attorney denies.  I do not have to make the determination as to who is credible on this point.  According to Norris himself, he had the presence of mind to tell the attorney to stop yelling at him or he should just turn around and go home.  Thus, I find that Norris knew that he could exert at least some control over the situation.

---

[6]  In the medical notes of February 7, 2011, PA Shanks noted that Norris was concerned that he was not going to win his case because he did not come in for treatment immediately after the accident.  (A60).  This implies that Norris had been having some communications with counsel or others around that time, and, perhaps, hearing some unfavorable information.

When he got to the courthouse and realized that Brooks was not there, Norris got his phone number from Brooks' wife, and called Brooks.  Brooks was apparently busy at work and could not clear his calendar to attend.  However, Brooks did not suggest that the mediation be delayed or rescheduled, or express any concern that Norris was not capable of participating in the mediation without him.

Norris recalls meeting with all the parties and the Judge in the courtroom.  He recalls that the parties made opening statements, and the fact that the defendants denied that he had been seriously injured.  Thus, he was aware from the beginning of this lengthy day that the defendants were not going to offer him the money that he wanted to settle the litigation.

The mediation lasted from approximately 10:00 a.m. to 4:30 p.m.  The Judge spent most of the time talking to the defendants, as there were a number of them with divergent interests, and apparently there were some insurance coverage issues.

I find that Norris was fully engaged during the mediation.  For example, Norris recalls the Judge reading from a paper which said that statistically, if you go to trial you often get less money than in mediation.  He also recalled that the Judge said she would get him as much money as she could.  Thus, I find that Norris understood that this was a negotiation process, and that he had the right to go to trial if the case did not settle, although there were risks.

Judge Bowler met with Attorneys Orlando and McCormick and Norris approximately 4-5 times during the course of the day, conveying the settlement offers from the

defendants and bringing back the plaintiff's responses.  The evidence is that the opening

offer was approximately $30,000.  Thus, I find that Norris knew from early in the day

that he was not likely to get the amount of money he wanted — it was not sprung on him

at the end of the day.  Norris had ample time to assimilate the information and discuss it

with his attorneys.

Moreover, Norris called his brother again during the mediation, before accepting

the final offer of $200,000.  During that conversation, according to Norris, he told Brooks

that he was sitting in the mediation, and that the defendants were not offering him much

money.  Norris told Brooks that he thought the case was worth a million dollars, but that

he was being pressured into taking $200,000.00.  According to Brooks, he told Norris that

he did not have an opinion as to whether he should take the settlement because he did not

have enough information about the case.  Brooks believed that Norris understood the

mediation process, but was not happy about it.  He was unhappy with counsel, and felt

coerced and pressured into taking the final amount.

During this phone conversation, Brooks spoke to Attorney Orlando who also

sounded frustrated.  Attorney Orlando said that this was the best that they could do.

Brooks did not recommend stopping the mediation, or that Norris not take the settlement.

I find, however, that Brooks and Norris understood that the plaintiff did not have to take

the settlement, and could proceed to litigate the case.  Brooks testified that Norris knew

that the case was going to be settled if he agreed to the number.

As further evidence that Norris was engaged during the mediation, he testified that Attorney Orlando had told the Judge that Norris might be getting worse, and might suffer from early onset Alzheimers.  However, when the Judge asked the attorney for the medical records, counsel did not have them with him.[7]

Norris also testified that Attorney Orlando had said that the Judge said that the defendants had some secret information, and that if he went to trial he would get nothing, so that he should take the deal.  According to Norris, Attorney Orlando said that he was my lawyer, he'd been doing this for 30 years, and that Norris should take the deal or he would get nothing.  While plaintiff's counsel deny that there was any such secret information (or that they pressured Norris into taking the settlement), it does appear that the defendants had video surveillance of the plaintiff doing work, and that there was some concern about how this would affect his credibility at trial.  Again, this court has very limited information about why the case settled at the amount it did.  This testimony by Norris, however, is further evidence that he was following the events of the mediation process — although he was unhappy at the way they were proceeding.

Norris testified that he did not have anything to eat because he did not have any money, and that he had a headache and did not feel well during the entire day.  While I do not credit this testimony, even if true it does not negate the fact that he was clearly aware of all the events going on in the mediation, and understood what was happening.

---

[7] Such a prognosis appears in detail in Dr. Isaac's post-mediation notes of January 20, 2012.  (Ex. 3).

This court does note, however, that there was a great deal of down-time while the Judge was speaking to the defendants, and there is a cafeteria in the courthouse.  Thus, Norris could have gotten some food.  His attorneys had the time to eat lunch, and Norris could have joined them (which they said he did).  In addition, Norris testified that he had gone back to his house to get his wallet that morning, after he had left without it, so it is unclear why he would not have had any money with him.  In any event, I find it significant that Brooks described Norris as being irate, distraught and emotional, but did not testify that Norris complained about how he was feeling during their phone conversations.  If Norris did not eat, it apparently was by choice.

Towards the end of the mediation process, the defendants were at about $185,000. Attorney Orlando went to speak to Judge Bowler alone, and told her that the case could not settle for less than $200,000.00 and a waiver of the workers compensation lien, which was about $20,000.  Norris does not dispute Attorney Orlando's testimony that he had received Norris' permission before making that demand.  Judge Bowler discussed the demand with the defendants, and soon thereafter reported to the plaintiff and counsel that the case was settled for that amount.[8]

_____

[8] This court recognizes that the attorneys testified that they repeatedly advised Norris about the mediation process, that the $900,000 demand was not what they expected to be able to get, the strengths and weaknesses of the case, and that he did not have to take the settlement, among other things.  They also deny pressuring him in any way to take the settlement, although they do admit recommending the settlement.  Since the plaintiff has indicated that he intends to sue his attorneys for malpractice if this court finds the settlement agreement enforceable, this court declines to make findings relating to the conduct of counsel during the mediation, except as testified to by Norris.  This is not to say that this court finds all of the testimony of any party credible.  Rather, even assuming all of Norris' testimony to be true, this court finds no basis to set

According to Norris, he accepted the settlement offer because he wanted to go home.  He did understand that as far as the court was concerned, the parties had settled the case.  However, he assumed that his lawyers would be able to file a motion that said he did not want to take the deal, so that they would go to trial.   As Norris testified, because he did not sign anything, he secretly thought that there was a way to get out of the agreement.[9]

Norris drove home with Attorney Orlando.  During the ride home, Norris testified that he discussed the fact that he could use some of the money for his hydroelectric project, and he was hopeful that it would be a successful project.  Attorney Orlando describes Norris as being exuberant that the case was over, which Norris denies.  According to Norris, Attorney Orlando told him that the case could not be reopened.

All of Norris's statements after the mediation indicate that he was fully aware of the nature and consequences of the settlement.  For example, Skinner testified that when he saw Norris as he was coming home from the mediation, Norris looked like somebody had "kicked his dog."  Norris said words to the effect that he had just made a mistake, that he had settled, but not for what he thought they were going to get, and that he had to

---

aside the settlement agreement.

[9]  Plaintiff's present counsel has made it clear that plaintiff is not claiming that he lacked the intent needed to enter into an enforceable agreement, or that there was no meeting of the minds because Norris secretly believed he could get out of the settlement.

call his brother.  Skinner used the term "buyer's remorse" in describing his conversation with Norris.

Norris and Ketchopulos testified that Norris called Ketchopulos when he got home.  According to Ketchopulos, Norris said "Dude, I don't know what happened.  I don't know what just happened.  I was told if you don't take the deal, you're going to get nothing."  He also reviewed with Ketchopolous the amount he would get after payment of expenses and attorneys' fees and said words to the effect that "it's not even going to take care of me for a year."

Norris also called Giglio after the mediation.  He told her he had been told by the Judge to take the deal and he was upset.  He felt coerced into taking the deal.  She told him to call Brooks, and to get a second opinion.  She was somewhat surprised that he did follow through and contact Attorney Miller.

When Norris spoke to Brooks the day after the mediation, Norris felt that the mediation had been mishandled and that he had been treated inappropriately by counsel.

Perhaps the clearest proof that Norris was fully aware of the nature and conse-quences of his actions in settling the case can be found in his handwritten notes, which he wrote within days of the mediation, perhaps after consulting with new counsel.  As he wrote (to the best of the court's ability to read):

Oct. ? 2011

Got up head ache- queer (sick)

Showered got dressed.  Forgot my phone & wallet, drove to Orlando's office and met with Brian Mc.  Drove in with him.  On the way (Essex) He showed me the paper asking 900,000 $ I said I thought you were going for 1,000,000 $.  He started yelling loud, that there were a lot of problems with the case.  I said if your going to yell at me for asking a ? we can turn the car around right now because I not going to be yelled at for asking a question!  He backed down stopped yelling.  We drove in didn't talk much.  Meet Joe Orl.In Front of Building!  (Court Room) Brian Mc. talked BLA, BLA, BLA, for 5 minutes – other lawyers talked BLA BLA, said I wasn't hurt, and barely even got wet.  Had only a scratch on my head.  I forget the next few hrs back and forth.  They were offering 30,000 to $40,000.  Orlando told the Judge I wood get worse in time.  The (judge)? said were are your medical report?  Joe said he didn't have any!  Judge? said why not you should have!  The judge read a paper saying that 90% of people who don't take the deal in mediation get less at TRAIL!  She said she was working hard to get me as much as she could (joke?)

Joe & Brain & Me are in a small room.  Brain seems very nervous pacing the floor: Joe's doing most of the talking.  Keeps says take the deal take the deal.  I keep saying No.  Tryed calling Brooks.  Didn't have his No.#.  Called his wife Terry.  Joe talked to Brooks.  Then went out to the judge.  Said the judge had some secret info and that I better take the deal if we got to Trail I'll get less or nothing.  I didn't have anything to eat or drink all day.  I have a bad headach & felt sick it was getting late in the day.  Joe keep saying I am you LAWYER.  I've been doing this for 30 years.  I am telling you take the deal or if you to go trail you will lose & get nothing the judge told me so!  Take the deal! So I took the deal.  Had to drove home with Joe!  Just wanted out of his car! (what a jurk)  Asshole Liar!  I knew a just got screwed [crossed out] Fucked).  Called sister Deb.  She was pissed when I told her the story.  Call Keith Miller.

(Ex. 17) (some punctuation and spelling and capitalization corrected).  From this the court takes the fact that Norris understood that he had settled the case but was very unhappy about it.

## Appointment of a Conservator

A few days after the mediation, Norris, on his own, contacted his present attorney, Keith Miller, for whom he had done some work in the past.  Mr. Miller suggested getting a conservator appointed as a means to reopen the litigation.  Up until that point, no-one had suggested the appointment of a conservator, and, as noted above, there was nothing in Norris' medical records which would have indicated the need for a conservator.

The only reason that either Norris or his brother considered the appointment of a conservator was to reopen the litigation.

On November 2, 2011, Norris saw Dr. Isaac.  This was two weeks after the mediation, and according to Dr. Isaac, Norris told the doctor that he did not feel that justice had been served during the mediation.  According to the office notes, the doctor also knew that he was applying for a conservatorship.  (A71).

Doctor Isaac testified that Norris' executive functioning had not deteriorated since his last visit.  Nevertheless, based on his notes it would appear that Norris's condition had worsened significantly.  Thus, while the record is unclear as to whether Dr. Isaac consulted with counsel before writing his notes of this visit, the language is so different from the earlier office visits and the description of  Norris' condition is so tailored to the language of the conservatorship application, that it is more than a logical inference that Dr. Isaac intended to assist Norris in obtaining a conservator if that is what he wanted.  Moreover, to the extent that the notes described limitations that Norris was himself reporting, the records are clear that he had made no such reports before.

Dr. Isaac reported the accident and its effects as follows:

> on 8/26/2008, Norris suffered a devastating, potentially mortal brain injury when a boat landing welded to a tower fell on his head and dragged him 80 feet into the water.  He was underwater for at least four minutes, he had significant memory loss, dysequilibrium, lethargy and cognitive loss.  he was initially dx'd w/ a postconcussive syndrome, but his cognition never significantly improved.  at this time his anoxic brain injury/traumatic brain injury has a poor prognosis for any recovery to baseline, the symptoms were expected to last six to twelve months, but at this time are believed to be irreversible (it has been more than three years).
>
> his brain injury has severely limited his social, economic and personal functioning and well being.  he has issues with receiving and evaluating higher order information and with making/communicating decisions.  he lacks the ability to meet essential requirements for physical health and safety.  he is unable to manage property or business affairs effectively.  he is able to manage all activities of daily living, including toileting, meal prep, personal hygiene, driving, etc.  I believe he should not run a business, fly an airplane (he was a flight instructor), manage finances or other complex affairs/commitments/arrangements.

(A69).  There is no mention in the notes of any treatment for depression or sleep apnea, or an explanation of where the additional details concerning the accident came from or, most importantly for present purposes, how to draw the line between what Norris can and cannot do.

Dr. Isaac testified at trial that he had never recommended that a conservator be appointed.  He always believed that Norris was able to follow his treatment plan if he explained it slowly and carefully.

On November 8, 2011, Norris met with Dr. Gross, whom he had last seen on November 13, 2009 and at which time he had discussed with Norris his recently-diagnosed severe obstructive sleep apnea.  Prior to that time, on August 20, 2009, Dr.

Gross had concluded that, in addition to likely having sleep apnea, Norris suffered from a

severe anoxic brain injury and was slowly improving.

The visit of November 8, 2011 was in conjunction with having Dr. Gross complete

the medical certificate for the appointment of a conservator.  At that visit, Dr. Gross

diagnosed Norris with having mild cognitive impairment and suffering from post-

concussion syndrome.  (Ex. 5)  He described Norris's history as follows:

> Mr. Marston continues to have cognitive difficulties.  He has
> difficulty multitasking, solving complex problems, and maintaining
> sufficient stamina to complete his work.  This is similar to the
> problems he is [sic] reported in the past.  He is able to continue his
> business, but not at the same level or with the same efficiency as
> before.

(Ex. 5).  Dr. Gross testified that Norris had reported to him that he did not feel that he

was capable of making decisions for himself, particularly complex decisions that had to

do with his financial well-being, and that he wanted his brother to make those decisions

for him.

On November 8, 2011, Dr. Gross completed the medical certificate for the

appointment of a conservator.  (A74).  Therein, he reported that Norris had suffered an

anoxic brain injury in August 2008, and that it was unlikely that his condition would

either improve or worsen in the next 90 days.  (A75).  He reported that Norris "cannot

make good decisions in his own self interest," that he "can't remember numbers, forgets

to do things properly at work."  (A76).  On the other hand, Norris was reported as being

able to "dress, drive, cook a meal, eat, do some work."  (Id.)  While Dr. Gross felt that

Norris "cannot manage money, bills" he felt that he "can manage limited spending money."  (A77).  There is no explanation of why he could manage some money, but not other money.

Brooks was appointed temporary conservator on December 2, 2011.  (Docket No. 72).  He was appointed permanent conservator on January 13, 2012.  He was granted "all powers over the property and business affairs of the Protected Person which are or may be necessary for the best interest of the Protected Person and the Protected Person's immediate family pursuant to G.L. c. 190B, §§ 5-423(c)."  (Ex.11; Docket No. 94).

Despite the sweeping language of the conservatorship, Brooks has done nothing in furtherance of that position.  He is not involved in Norris' affairs in any way, other than by entering an appearance in this case.  He is unaware of his brother's financial situation and feels that his brother is free to manage his financial affairs on his own.  He has never reviewed his brother's books or records, does not know what jobs he works on, does not know his income or expenses and has no information about his brother's financial condition.  He has made no personal or legal decisions for Norris since being appointed as a conservator.  He is also unaware of his brother's medical condition, apart from any papers which may have been filed in connection with the conservatorship.

Norris does not expect his brother to be involved in any of his day-to-day decisions, or involved in managing his business or bank accounts, and he doesn't expect him to have to approve any agreements Norris may enter into for work.  Norris assumes

that his brother will be available to help him make "big decisions" so he "doesn't make any more big mistakes."

### Dr. Gross's Opinion

Norris, along with his attorney,  saw Dr. Gross on April 12, 2012.  (Ex. 5).  In his notes, Dr. Gross wrote only that Norris "continues to have significant difficulty with concentration attention memory and energy level.  If anything he is more symptomatic than he has been in the past.  I had a long discussion with him and his attorney regarding his symptoms."  (Id.).  He listed Norris's condition only as "postconcussive syndrome."  (Id.).

At the evidentiary hearing, Dr. Gross opined that Norris was unable to understand in a reasonable manner the nature and consequences of the settlement between the parties on October 17, 2011.  However, Dr. Gross also opined that Norris clearly understood the nature of his actions in the mediation, in that he understood that there were negotiations, the amount of the settlement, and other basic facts.  He also opined that Norris was capable of making some decisions on his own.  Given Dr. Gross' inability to define the limits of the types of decisions Norris could reasonably make, or the circumstances which would allow Norris to make a reasonable decision in his own best interest, or the actual circumstances surrounding Norris's decision to agree to the settlement, I find his opinion that Norris was unable to understand in a reasonable manner the nature and consequences of the settlement to be unhelpful and unpersuasive.  Moreover, given the events that

actually transpired at the mediation, I find that any concerns that Dr. Gross may have had about Norris's ability to process information were satisfied.

According to Dr. Gross, because of his mental condition, Norris would have difficulty processing several different pieces of information and quickly coming to a conclusion about whether he should or should not do something. Thus, the speed with which Norris would have to make a decision was relevant to the doctor's opinion. However, as detailed above, Norris had all day in which to process the fact that the amounts being offered were substantially less than what he would need to live on without working. Norris discussed the fact that he was only being offered a limited amount with his brother, if not his counsel. As Doctor Gross testified, in circumstances where Norris had multiple opportunities to review his options and discuss them with others, he was mentally capable of making a thoughtful decision. The mediation was such a circumstance.

It is also unclear to this court what it is alleged that Norris did not understand. Dr. Gross testified that, if Norris testified that he thought that the case was worth a million dollars, he was offered only $200,000, and he understood that he was not getting more if he took the offer, it would be Dr. Gross' opinion that, at least on the day he testified about, Norris was able to make a decision and understand the consequences of the decision. Since Norris told multiple people on the day of the mediation exactly these facts, this court can only conclude that he was able to make a decision and understand the consequences of his decision on that day.

Dr. Gross further testified that he believed that Norris understood that he was entering into a settlement, and that he was ending the lawsuit, but that in his opinion he did not think that Norris understood how this amount of money would affect his life. Leaving aside whether that is the appropriate legal standard, as Norris' conversation with Ketchopulos made clear, he understood exactly how the money would affect his life and that it wasn't even enough to keep him for one year.  Thus, Dr. Gross' opinion is simply belied by the record.  At most, what the record may show is that Norris mistakenly assumed that he could get out of his decision by filing a motion.  However, since counsel has made it clear that the issue of whether Norris had the requisite intent to form a contract is not before the court, the fact that Norris may have thought that he could escape the consequences of his action is irrelevant.

## IV.   RULINGS OF LAW

### A.   Standard of Review

In the usual case involving a motion to enforce a settlement, the court will apply ordinary principles of contract law to determine whether the parties agreed to enter into a binding settlement agreement.  See Powell v. Omnicom, BBDO/PHD, 497 F.3d 124, 128 (2d Cir. 2007) ("A settlement agreement is a contract that is interpreted according to general principles of contract law....  Once entered into, the contract is binding and conclusive.").  In the instant case, there is no dispute that there was mutual assent to all the material terms of the contract.  See Eswarappa v. Shed Inc./Kid's Club, 685 F. Supp. 2d 229, 233 (D. Mass. 2010) ("there must be mutual assent to all material terms of a

contract to render it enforceable"). Norris understood the amount being paid, that it would end the litigation, and that he would not be able to recover any further amounts from these defendants. The fact that Norris may have secretly thought that he could back out of the agreement, even if true, would not negate the agreement. Courts determine if there is mutual assent, "not on the basis of what goes on inside the parties' heads, but rather on the basis of what they say and do." Salem Laundry Co. v. N.E. Teamsters & Trucking Indus. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987).

There is a presumption that a person who manifests assent to a settlement agreement has the full legal capacity to incur contractual obligations. See Restatement (Second) of Contracts § 12(2). Thus, a party claiming incompetence has the "extremely heavy burden" of proving that status at the time of the settlement. Lopez v. Kempthorne, Civil Action No. H-07-1534, 2010 WL 4639046, at *3 (D. Tex. Nov. 5, 2010). Where there is conflicting evidence as to whether the party was unable to understand in a reasonable manner the nature and consequences of the transaction, it is up to the factfinder to determine whether that burden has been met under the circumstances presented in the case. See In re Rains, 428 F.3d 893, 901-02 (9th Cir. 2005) (finding no error in bankruptcy court's conclusion that debtor was competent to enter into a settlement agreement where there was conflicting testimony regarding debtor's competence to conduct business); Meserve v. Jordan Marsh Co., 340 Mass. 660, 668, 165 N.E.2d 905, 909 (1960) (finding that evidence was sufficient for trial court to conclude that party had the mental capacity to enter into a lease agreement). Moreover, "the weight to be given

expert medical testimony is within the discretion of the trier of fact" and the court may reject such an expert opinion if it finds it unpersuasive or otherwise outweighed by conflicting evidence.  In re Rains, 428 F.3d at 902.

### B.      Standard for Determining Mental Capacity

As detailed above, Norris has moved to reopen the litigation on the grounds that he lacked the mental capacity to enter into a contract on October 17, 2011.  For the reasons detailed in this court's Memorandum of Decision and Order on Motions to Enforce Settlement, to Reopen Case and to Quash (Docket No. 108), the question whether the plaintiff lacked the mental capacity to enter into a settlement contract is governed by federal common law, as set forth in the Restatement (Second) of Contracts ("Restatement").

Pursuant to the Restatement, "[a] natural person who manifests assent to a transaction has full legal capacity to incur contractual duties thereby unless he is . . . mentally ill or defective . . . ."  Restatement § 12(2).  It further provides, in relation to the effect of mental illness or defect on the capacity to contract, that

> [a] person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect (a) he is unable to understand in a reasonable manner the nature and consequences of the transaction, or (b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition.

Id. § 15(1).  In the instant case, the plaintiffs do not claim that Norris' mental disability[10] rendered him incapable of acting reasonably in relation to the settlement.  They claim only that his condition prevented him from having a reasonable understanding as to the nature and consequences of the transaction.

The two standards are quite different.  The test for incapacity on which the plaintiff relies, part (a), is known as the traditional, or "cognitive" test.  See, e.g., Sparrow v. Demonico, 461 Mass. 322, 328-29, 960 N.E.2d 296, 301-02 (2012); Ortelere v. Teachers' Retirement Bd. of the City of N.Y., 25 N.Y.2d 196, 202, 250 N.E.2d 460, 464 (1969).  It focuses on whether "the party whose contract it is sought to avoid [was] in such a state of insanity at the time [of contracting] as to render him incapable of transacting the business."  Sparrow, 461 Mass. at 328, 960 N.E.2d at 301 (quotations omitted).  See also Ortelere, 25 N.Y. 2d at 202, 250 N.E.2d at 464 (explaining that under the cognitive test, the relevant inquiry "is whether the mind was so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction") (quotations and citation omitted).

The cognitive test is distinct from the test for mental incapacity set forth in Section 15(1)(b) of the Restatement, which is known as the modern, or "affective" test.  Sparrow, 461 Mass. at 329, 960 N.E.2d at 302; Ortelere, 25 N.Y.2d at 204, 250 N.E.2d at 465. This second test recognizes that "incapacity to contract or exercise contractual rights may

_____

[10]  For purposes of this decision, this court assumes that Norris suffered from a mental defect following the accident.

exist, because of volitional and affective impediments or disruptions in the personality, despite the intellectual or cognitive ability to understand." Ortelere, 25 N.Y.2d at 199, 250 N.E.2d at 462.  See also Sparrow, 461 Mass. at 329, 960 N.E.2d at 302 (explaining that the modern test "recognizes that competence can be lost, not only through cognitive disorders, but through affective disorders that encompass motivation or exercise of will"). Unlike the cognitive test, which asks whether the person at issue understood the nature and consequences of the transaction, "the controlling consideration" for purposes of the affective test "is whether the transaction in its result is one which a reasonably competent person might have made." Sparrow, 461 Mass. at 330, 960 N.E.2d at 303; Restatement § 15, cmt. b.  Accordingly, in cases where the affective test is at issue, "the critical fact often is whether there was a "departure from the normal pattern of similar transactions, and particularly inadequacy of consideration." Restatement § 15, cmt. c.  Since, in the instant case, in addition to expressly waiving any reliance on § 15(1)(b) of the Restatement, the plaintiff made a conscious decision not to explore whether the settlement was a reasonable one, there is no basis for this court to consider whether the parties' settlement was one which a reasonably competent person might have made.

## C.    **The Plaintiff was Mentally Competent**

Under Section 15(1)(a) of the Restatement, a party lacks the mental capacity to contract if he cannot comprehend the nature and quality of the transaction, together with an understanding of its significance and consequences.  See Krasner v. Berk, 366 Mass.

464, 467-68, 319 N.E.2d 897, 899-900 (1974).[11]  Generally, in order to prevail on such a claim, the plaintiffs must provide proof of irrational or unintelligent behavior.  Restatement § 15, cmt. c ("Proof of irrational or unintelligent behavior is essential" to proving incompetency to contract).  It is not enough to show that there was an intellectual weakness which did not amount to a lack of power to comprehend.  Krasner, 366 Mass. at 467, 319 N.E.2d at 899.  See also Shepard v. Fla. Power Corp., No. 8:09-CV-2398-T-27TGW, 2011 WL 1465995, at *3 (M.D. Fla. Apr. 18, 2011) ("Mere mental weakness is insufficient to set aside an agreement if the person had sufficient intelligence to understand the nature and effect of the transaction ....").  The plaintiffs must show that Norris' mental condition was such that he could not execute the settlement "with understanding of its meaning, effect and consequences."  Krasner, 366 Mass. at 467, 319 N.E.2d at 900 (quoting Adams v. Whitmore, 245 Mass. 65, 68, 139 N.E. 831, 833 (1923)).

Based on the facts presented, the conclusion is inescapable in this court's view that Norris understood the nature and consequences of the settlement.  He understood he was attending a mediation for the purpose of trying to settle the case, he understood that he did not have to accept any settlement offer, he understood that if he did not accept a settlement the case would proceed to trial, he understood the amount he was being offered and that the amount was significantly less than he thought the case was worth, he

---

[11]  Although the court in Krasner was applying Massachusetts law, it noted that state law regarding the capacity to contract "do[es] not differ in substance" from the rule set forth in the Restatement and relied on by the plaintiffs in this case.  Krasner, 366 Mass. at 467-68, 319 N.E.2d at 899-90.

understood that the amount he would receive would not be enough to keep him for even a year and that he would have to return to work, he understood that he was having trouble mentally and physically at work and he understood that if he accepted the settlement the case was over, among other things.  Under such circumstances, the plaintiff has not met his burden of proving that he was unable to understand in a reasonable manner the nature and consequences of the transaction.  See, e.g., In re Rains, 428 F.3d at 901-02 (affirming bankruptcy court's finding that debtor had mental capacity to enter into a binding settle-ment agreement where bankruptcy court credited declarations from witnesses who per-sonally observed debtor and reported that he participated in negotiations and appeared to have a full understanding of what was transpiring and of the terms of the settlement rather than declarations of experts who found that debtor lacked the mental capacity to conduct business affairs at the time of the settlement negotiations); Meserve, 340 Mass. at 668, 165 N.E.2d at 909 (affirming trial court's conclusion that lessor had mental capacity to enter into a lease where, despite conflicting evidence regarding lessor's mental condition and how accurately lessor understood terms of the lease, those present at the negotiations thought lessor knew what he wanted and understood what was being discussed); Shepard, 2011 WL 1465995, at *4 ("Plaintiff apparently alleges that it was his attorney's pressure to settle that induced him to execute the agreement.  However, Plaintiff's dissatisfaction with his attorney's advice or conduct does not demonstrate that he lacked capacity to execute the mediated settlement agreement.").  See also Sparrow, 461 Mass. at 334, 960 N.E.2d at 306 (in the absence of medical evidence or expert testimony, evidence was

insufficient to establish that party lacked capacity to enter into settlement where she understood at the time that she was participating in a mediation to discuss settlement of the lawsuit; was aware that the subject of the mediation was to resolve the parties' dispute; participated in the mediation and listened to the arguments of counsel; and "couldn't believe how things [were] turning out").

The plaintiff has suggested that this court may render a finding of incompetence based upon evidence that Norris did not fully comprehend his counsels' strategy during the mediation or fully understand how his lawyers were valuing his claims for settlement purposes. See note 3, supra. However, as described above, a showing of mental incapacity requires more than evidence of intellectual weakness. See Krasner, 366 Mass at 467, 319 N.E.2d at 899. It requires an inability to comprehend "in a reasonable manner" the nature and significance of the transaction. Restatement § 15(1)(a). A person may have a reasonable understanding as to the purpose of settlement negotiations, and the effect that a settlement would have on his claims, without understanding the intricacies involved in the negotiations or in the process of reaching a final agreement. See Prudential Ins. Co. of Am. v. Hamilton, No. 3:12cv214, 2012 WL 3777414, at *2 (W.D.N.C. Aug. 30, 2012) (mental capacity to contract does not require a person "to act wisely or discreetly" or "to drive a good bargain[.]" It only requires that the person "be in such possession of his faculties as to enable him to know at least what he is doing and to

contract understandingly.").[12]  If a deeper understanding were necessary to render a

person competent to settle a lawsuit, few settlement agreements entered into by non-

lawyers would be enforceable.  Here it is clear that Norris understood generally that there

were risks in proceeding to trial that the settlement would avoid.

### D.    The Ortelere Decision

The plaintiff contends that this case should be governed by the decision of the

New York Court of Appeals in Ortelere v. Teachers' Ret. Bd. of the City of N.Y., 25

N.Y.2d 196, 250 N.E.2d 460 (1969), a case involving an action by the husband of a

deceased schoolteacher to set aside his spouse's election of benefits under a public

employees' retirement plan on the grounds that his spouse was mentally incompetent at

the time she made the election.  However, this court finds that the facts of Ortelere are

distinguishable from the circumstances presented here, and that the court's analysis in

that case in not applicable to the instant litigation.

In Ortelere, Mrs. Ortelere, the schoolteacher at issue, originally selected a retire-

ment option that would have paid her less in periodic benefits upon retirement, but would

have allowed her husband to receive benefit payments following her death.  Ortelere, 25

N.Y.2d at 200, 250 N.E.2d at 462.  Subsequently, at age 60, Mrs. Ortelere suffered a

nervous breakdown, took a leave of absence from her job, and was diagnosed with

---

[12]  Although the court in Prudential Ins. Co. was describing North Carolina law, it noted
that such law was consistent with law applied in the "vast majority of jurisdictions" with respect
to competence to contract.  Prudential Ins. Co. of Am., 2012 WL 3777414, at *2.

psychosis.  It was later discovered that she was suffering from cerebral arteriosclerosis as

well.  Id. at 199-200, 250 N.E.2d at 462.  When Mrs. Ortelere's leave of absence expired,

and she was still undergoing treatment for her psychosis, she executed a new retirement

option which allowed her to receive the maximum retirement allowance during her life-

time, but extinguished all interests following her death.  Id. at 200, 250 N.E.2d at 462-63.

The new election was "evidently unwise and foolhardy" given her medical condition and

the fact that any income for the surviving spouse would need to come from Mrs.

Ortelere's retirement benefits.  Id. at 198, 201, 250 N.E.2d at 461, 463.  In fact, less than

two months after making the new election, Mrs. Ortelere died, leaving her husband

without any benefits.  Id.  Her husband then brought suit to void the retirement election

based on a claim of incompetence.  Id. at 199, 250 N.E.2d at 462.

Although it was undisputed that Mrs. Ortelere was suffering from mental illness, it

was also undisputed that "she had complete cognitive judgment or awareness when she

made her selection."  Id.  Accordingly, the court concluded that the traditional standard

governing incapacity to contract, which asks whether the person could comprehend the

nature of the transaction, was too restrictive to encompass her condition.  See id. at 202-

04, 250 N.E.2d at 464.  Nevertheless, the court held that the retirement election was

voidable under the "modern rule" set forth in the Restatement of Contracts, which

provides that "[a] person incurs only voidable contractual duties by entering into a

transaction if by reason of mental illness or defect . . . (b) he is unable to act in a

reasonable manner in relation to the transaction and the other party has reason to know of

his condition." Id. at 204, 250 N.E.2d at 465 (quoting Restatement, 2d, Contracts § 18C).[13]  Specifically, the court found that there was evidence showing that, because of her mental condition, Mrs. Ortelere was incapable of making a rational decision at the time she changed her election.  Id. at 206, 250 N.E.2d at 466.  It also found the retirement system was, or should have been, fully aware of her condition.  Id. at 205, 250 N.E.2d at 465-66.  Accordingly, both of the conditions for avoidance set forth in sentence (b) of the Restatement were satisfied in that case.

The plaintiffs' attempt to apply Ortelere to the instant case is misplaced.  As an initial matter, as detailed above, the modern rule set forth in Section 15(1)(b) of the Restatement and relied on by the court in Ortelere is distinct from the test on which the plaintiff is proceeding in this case.  See id. at 202-05, 250N.E. 2d at 464-65 (distinguishing the two tests for incapacity to contract).  Therefore, the legal rationale supporting the court's decision in Ortelere is not applicable here.

The plaintiff nevertheless argues that, like the schoolteacher in Ortelere, Norris' decision to enter into the transaction in this case was patently irrational and demonstrates a lack of mental capacity.  In particular, the plaintiff argues that no one in Norris' position would have accepted such a low settlement figure, given the extent of his injuries and the impact that those injuries had on his ability to work.  This argument, however, is unpersuasive here where, as discussed in detail above, the reasonableness of the

---

[13]  The provision of the Restatement relied on by the court in Ortelere is now found at Section 15(1)(b) of the Restatement.

settlement was not explored.  If, as Norris testified he was told, there was a significant

risk that if he proceeded to trial he would recover nothing, a settlement of $200,000 plus

a waiver of the workers' compensation lien was not patently irrational.

### E.    Dr. Gross' Opinion

Finally, as discussed more fully above, this court does not find the opinion of Dr.

Gross to be helpful or persuasive as to Norris' mental capacity to enter into the settlement

agreement.  While acknowledging that, in his opinion, Norris could under certain

circumstances enter into a mediated settlement of the type that was reached on October

17, 2011, Dr. Gross was unable to explain why Norris lacked the mental capacity to enter

into the agreement he actually reached.  Similarly, Dr. Gross could not explain what

consequences of the settlement Norris lacked the mental capacity to understand.  Finally,

to the extent that Dr. Gross had concerns about Norris' ability to process information

quickly, or to make decisions without consultation with others, I find his concerns

unwarranted in the instant case.  Norris had all day to process the fact that the defendants

were offering substantially less than he wanted and he had the chance to talk to his

brother and others.  The fact that they may not have given him the advice he wanted does

not render him incompetent to make his decision.

## V.  ORDER

For all the reasons detailed herein, the plaintiff has failed to meet his burden of

proving that he was unable to understand in a reasonable manner the nature and

consequences of the settlement reached on October 17, 2011.  Therefore, the

plaintiff/intervenor's motion to reopen (Docket No. 93) is DENIED, and the motions to

enforce the settlement agreement (Docket Nos. 66, 67 & 71) are ALLOWED.


      / s / Judith Gail Dein          
Judith Gail Dein
United States Magistrate Judge